IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

JEREMIAH D. DOTSON,

        Plaintiff,

v.                                     CIVIL ACTION NO. 2:21-cv-00110

NICHE POLYMER LLC,

        Defendant.

**MEMORANDUM OPINION AND ORDER**

Pending before the Court is Defendant Niche Polymer LLC's ("Defendant" or "Niche Polymer") Motion for Summary Judgment. (ECF No. 59.) For the reasons stated more fully below, the Court **DENIES** Niche Polymer's Motion.

## I. BACKGROUND

*A. Factual Background*

This civil action arises out of an alleged workplace injury suffered by Plaintiff Jeremiah Dotson ("Plaintiff" or "Dotson") while performing maintenance work on the floor of Niche Polymer's manufacturing and processing plant. Niche Polymer is a custom compounder of thermoplastic resins that operates a manufacturing and processing plant in Ravenswood, West Virginia. (ECF No. 60 at 2.) Niche Polymer produces customer-specific plastic polymers utilizing recycled plastic. (ECF No. 63 at 1.) At the time of his alleged injury, Dotson was employed by Niche Polymer as a maintenance technician at the Ravenswood plant, and was responsible for repairing and maintaining equipment on the plant floor. (ECF No. 60 at 2.)

To produce its customer-specific plastic polymers, Niche Polymer uses an extruder machine to melt recycled plastic which, in turn, uses the melted plastic to create several long plastic strands. (ECF No. 63 at 2.) These plastic strands are then fed through a pool of water for cooling before being sent through a "pelletizer." (*Id.*) Niche Polymer's pelletizers are designed to cut the long strands of plastic into uniform, cylindrical pellets. To produce these pellets, the plastic strands are first pulled into the pelletizer via two feed rollers—an upper rubber roller and a lower metal roller—which grip the plastic strands as they are fed into the pelletizer. (ECF No. 60 at 2.) Next, the plastic strands are cut by a stationary blade and several rotating blades to form the uniform, cylindrical pellets. (*Id.*) Finally, the newly formed pellets are fed through an exhaust tube and into holding silos. (*Id.* at 2–3.) Each pelletizer is equipped with protective guards that prevent access to both rollers, as well as the blades. (*Id.* at 3.)

Over time, the pelletizers' rubber rollers form grooves from pulling the plastic strands produced by the extruder machine. (*Id.*) With these grooves, the rubber rollers cannot properly feed the plastic strands to the pelletizers' blades, resulting in the plastic strands not being uniformly cut. (*Id.*) To remedy this issue consistent with Niche Polymer's policies, maintenance technicians are tasked with either replacing the rubber roller, or removing it and shaving it down on a lathe. (*Id.*) Niche Polymer labels this task "evening the rollers." (*Id.*)

Niche Polymer's pelletizers can also "clog" due to a number of different factors. Niche Polymer admits that, in some cases, clogs in the pelletizers can occur due to worn or uneven rollers. (*Id.*) In these cases, grooves in the rubber rollers prevent them from effectively pulling the plastic strands into the pelletizer, resulting in a clog at the front of the pelletizer due to the extruder's constant production of plastic strands. (ECF No. 63 at 2.) In many other cases, though, clogs

2

result from residue buildup in a pelletizer's exhaust tube at the back of the pelletizer. (ECF No. 60 at 3.) In these cases, Niche Polymer claims that the obstruction can typically be removed with an air hose and without removing the protective guards, depending on the severity of the clog. (*Id.*) Niche Polymer labels this task "removing clogs." (*Id.*)

Niche Polymer maintains that "evening the rollers" and "removing clogs" are "distinct mechanical tasks, employing different tools and protocols and requiring attention to entirely different sections of the pelletizer." (*Id.*) Therefore, according to Niche Polymer, "an instruction to fix an existing clog in the pelletizer is separate and distinct from an instruction to even or otherwise adjust the rollers." (*Id.* at 4.) Dotson, however, asserts that an instruction to "clear a jam" in a pelletizer includes grinding down the pelletizer's rubber roller to level it out. (ECF No. 63 at 4.) Regardless of the task, however, both parties agree that Niche Polymer's written lockout/tagout policies require that maintenance technicians power down the pelletizer and isolate the equipment from its energy source before removing the pelletizer's protective guards and performing the required maintenance. (*Id.* at 3; ECF No. 63 at 2–3.)

Dotson alleges that former maintenance supervisor Jeremy Coleman[1] developed an alternative method to remedy pelletizer jams in contravention of Niche Polymer's written lockout/tagout policies. (ECF No. 63 at 3.) Dotson asserts that this alternative method involved the following steps: (1) remove the pelletizer's protective guard; (2) energize the pelletizer; and (3) utilize an "angle grinder" to grind the rubber roller down to make it even across its entire length. (*Id.*) According to Dotson, and at least one other current and one other former Niche Polymer

---

[1] Niche Polymer states that Jeremy Coleman was terminated in February of 2019—well before Dotson suffered his injuries. (ECF No. 60 at 5.)

3

employee,[2] this alternative method became "common practice" at Niche Polymer, and was known by everyone at the plant, including shift supervisors Ron Whited and Jason Adkins, plant manager Mike Litton, and other safety personnel. (*Id.*)

Dotson sustained the alleged injury on July 9, 2019 while performing maintenance work on Niche Polymer's Line 10 pelletizer. (*Id.* at 4.) Upon his arrival to work, Dotson alleges that Whited approached him and informed him that a "jam" had occurred at the Line 10 pelletizer.[3] (*Id.*) After speaking with Whited, Dotson approached the Line 10 pelletizer—which was being operated by Joel Seabolt that day—and began performing maintenance on the machine, utilizing the alternative method of shaving down the pelletizer's rubber roller while the pelletizer was energized and operating. (*Id.*) Dotson alleges—and Whited confirmed in his deposition testimony and statement to the Occupational Safety and Health Administration ("OSHA")—that Whited suspected that Dotson was performing maintenance on the Line 10 pelletizer in contravention of Niche Polymer's written lockout/tagout policies, but that he did nothing in response. (*Id.* at 4–5.) Moreover, Seabolt and Carl Stamm—who was "trying to clear backed up

---

[2] Current Niche Polymer maintenance technician, Denver Hinton, testified that shift supervisors Ron Whited and Jason Adkins had witnessed Niche Polymer employees utilize the alternative method for clearing jams, and that, on one occasion, he personally observed Adkins utilize this method. (ECF No. 63-5 at 2–4.) Moreover, Hinton testified that he observed Adkins training a new employee to utilize this alternative method, in contravention of Niche Polymer's written lockout/tagout policies. (*Id.* at 4–5.) Finally, Hinton testified that plant manager Mike Litton observed this method being utilized to clear jams. (*Id.* at 5.)

Former employee Carl Stamm testified via affidavit that "[m]ore than one member of Niche Polymer management knew about the practice of grinding the rollers," and that he "personally observed shift supervisor Ron Whited watching [Dotson] grinding a roller on Line 6 about two months before [Dotson] was injured." (ECF No. 63-7 at 1, ¶ 4.)

[3] Niche Polymer has attached to its Motion the Declaration of Ron Whited, which states that he "did not, on July 9, 2019, instruct Mr. Dotson to adjust the rollers, much less to do so in contravention of the lockout/tagout requirements." (ECF No. 59-5.) However, Dotson alleges, and Whited testified during his deposition, that uneven rollers can cause clogs or jams due to the rollers continuously pulling in plastic strands from the extruder in an improper fashion. (ECF No. 63-6 at 6–7.)

4

plastic strand" from the Line 10 extruder at that time—observed Dotson performing maintenance on the Line 10 pelletizer while it was energized and operating. (*Id.* at 5.)

While Dotson was performing maintenance on the Line 10 pelletizer, his angle grinder "caught on the roller and destabilized him." (*Id.*) Dotson then tried to catch himself with his right hand, which he alleges was immediately pulled into the pelletizer and exposed to the pelletizer's rotating blades. (*Id.*) The pelletizer then "shredded" Dotson's hand up to his middle finger. (*Id.*) After screaming in pain, Stamm ran over and unplugged the pelletizer. (*Id.*) After bleeding into the pelletizer for approximately 30 minutes while other maintenance personnel and co-workers attempted to free him, Dotson was finally freed and taken to the hospital. (*Id.*)

B. *Procedural Background*

On November 4, 2020, Dotson filed his Complaint in the Circuit Court of Jackson County, West Virginia, alleging a single claim for deliberate intent under West Virginia law. (ECF No. 1 at 1.) Niche Polymer removed Dotson's action on the basis of diversity jurisdiction on February 21, 2021. (*Id.*)

Niche Polymer filed its Motion for Summary Judgment and accompanying Memorandum of Law in Support on March 28, 2022. (ECF Nos. 59, 60.) Dotson timely filed his Memorandum in Opposition to Defendant's Motion for Summary Judgment on April 11, 2022. (ECF No. 63.) Niche Polymer timely replied on April 18, 2022. (ECF No. 67.) Accordingly, Niche Polymer's Motion for Summary Judgment has been fully briefed, and is now ripe for adjudication.

II. **LEGAL STANDARD**

Rule 56 of the Federal Rules of Civil Procedure governs motions for summary judgment. This rule provides, in relevant part, that summary judgment should be granted if "there is no

genuine issue as to any material fact." Summary judgment is inappropriate, however, if there exist factual issues that reasonably may be resolved in favor of either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). "Facts are 'material' when they might affect the outcome of the case, and a 'genuine issue' exists when the evidence would allow a reasonable jury to return a verdict for the nonmoving party." *News & Observer Publ. Co. v. Raleigh–Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010). When evaluating such factual issues, the Court must view the evidence "in the light most favorable to the opposing party." *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970).

The moving party may meet its burden of showing that no genuine issue of fact exists by use of "depositions, answers to interrogatories, answers to requests for admission, and various documents submitted under request for production." *Barwick v. Celotex Corp.*, 736 F.2d 946, 958 (4th Cir. 1984). Once the moving party has met its burden, the burden shifts to the nonmoving party to "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). If a party fails to make a sufficient showing on one element of that party's case, the failure of proof "necessarily renders all other facts immaterial." *Id.* at 323.

"[A] party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 256. "The mere existence of a scintilla of evidence" in support of the nonmoving party is not enough to withstand summary judgment; the judge must ask whether "the jury could reasonably find for the plaintiff." *Id.* at 252.

### III. DISCUSSION

Dotson's Complaint alleges just one cause of action, deliberate intent in violation of W. Va. Code § 23-4-2(d)(2)(B). (ECF No. 1-1 at 3.) Although there are several elements to this cause of action, Niche Polymer only seeks summary judgment on one element—intentional exposure. (ECF No. 60 at 10; ECF No. 67 at 2.) However, as explained below, because the evidence put forth by Dotson would allow a reasonable jury to return a verdict in his favor as to intentional exposure, summary judgment in Niche Polymer's favor is unwarranted.

### A. West Virginia's Deliberate Intent Statute

Generally, employers are immune from suit brought by their employees arising from workplace injuries under West Virginia's deliberate intent statute. *See* W. Va. Code § 23-2-6. However, this immunity is forfeited when the employer acts with a "deliberate intention" to cause the employee's injury. *Helmick v. Potomac Edison Co.*, 406 S..E.2d 700, 705 (W. Va. 1991). The elements of a deliberate intent claim under West Virginia law have been codified at W. Va. Code § 23-4-2(d)(2)(B), and require proof of the following:

> (i) That a specific unsafe working condition existed in the workplace which presented a high degree of risk and a strong probability of serious injury or death;
>
> (ii) That the employer, prior to injury, had actual knowledge of the existence of the specific unsafe working condition and of the high degree of risk and the strong probability of serious injury or death presented by the specific unsafe working condition;
>
> (iii) That the specific unsafe working condition was a violation of a state or federal safety statute, rule or regulation, whether cited or not, or of a commonly accepted and well-known safety standard within the industry or business of the employer;
>
> (iv) That notwithstanding the existence of the facts set forth in subparagraphs (i) through (iii), inclusive, of this paragraph, the person or persons alleged to have actual knowledge under subparagraph (ii) nevertheless intentionally thereafter exposed an employee to the specific unsafe working condition; and

7

(v) That the employee exposed suffered serious compensable injury or compensable death. . . .

As noted above, Niche Polymer only contends that Dotson has failed to set forth sufficient evidence to create a genuine issue of material fact that it intentionally exposed him to a specific unsafe working condition, in violation of subparagraph (iv) of West Virginia's deliberate intent cause of action. Accordingly, the Court will limit its analysis to a determination of whether a genuine issue of material fact exists only with regard to the intentional exposure element of Dotson's deliberate intent claim.[4]

B. *Intentional Exposure*

To satisfy the "intentional exposure" element, a plaintiff must offer "some evidence that, with conscious awareness of the unsafe working condition . . . , [they] [were] directed to continue working in that same harmful environment." *Tolley v. ACF Indus., Inc.*, 575 S.E.2d 158, 168 (W. Va. 2002). "In other words, this element, which is linked particularly with the subjective realization element [now actual knowledge], is not satisfied if the exposure of the employee to the condition was inadvertent or merely negligent." *Sias v. W–P Coal Co.*, 408 S.E.2d 321, 327 (W. Va. 1991). Proof of the employer's specific intent to injure the employee is not required, rather, "[t]he fact finder . . . reasonably may infer the intentional exposure if the employer acted with the required specific knowledge . . . and intentionally exposed the employee to the specific unsafe

---

[4] In his Memorandum in Opposition to Defendant's Motion for Summary Judgment, Dotson includes an argument that Niche Polymer management had actual knowledge of the alleged specific unsafe working condition. (ECF No. 63 at 7–9.) However, Niche Polymer has conceded that a genuine issue of material fact likely exists with regard to the actual knowledge element of Dotson's deliberate intent claim. (ECF No. 67 at 2.) Thus, the Court need not assess at this stage whether Niche Polymer had actual knowledge of the alleged specific unsafe working condition.

working condition." *Id.* (citing *Handley v. Union Carbide Corp.*, 620 F. Supp. 428, 439 (S.D. W. Va. 1985).

As Niche Polymer puts it, "there are two competing stories" as to intentional exposure in this case. (ECF No. 60 at 11.) On the one hand, Niche Polymer asserts that shift supervisor Ron Whited instructed Dotson "to unclog the back of the pelletizer," which it maintains does not involve replacing or grinding down the rubber roller, and is a separate and distinct task from grinding down the rollers. (*Id.*) On the other hand, Dotson claims that he was instructed by Whited to "clear the jam," which he claims he understood to include grinding the pelletizer's rubber roller with an angle grinder while the pelletizer was energized and operating. (ECF No. 63 at 9.)

It seems clear and undisputed among the parties that the alternative method of grinding down the pelletizers' rubber rollers with the front protective guard removed and the pelletizer energized and operating is an unsafe working condition. Moreover, Niche Polymer concedes that a genuine issue of material fact exists as to whether it had actual knowledge of this practice prior to Dotson's injury. Additionally, the record clearly indicates that Niche Polymer shift supervisors and maintenance supervisors have instructed maintenance technicians to perform this practice on numerous occasions prior to Dotson's injury, and, in some cases, have even performed this practice themselves.

What is not clear, however, is whether the practice of grinding down the rollers in this alternative fashion was inclusive in the instruction to maintenance technicians to "remove clogs," as Niche Polymer puts it, or "clear jams," as Dotson puts it. Thus, the critical question for purposes of resolving Niche Polymer's Motion for Summary Judgment is whether—by instructing

9

Dotson to "clear a jam" or "remove a clog"—he was also directed to grind down the Line 10 pelletizer's rubber roller by utilizing the alternative method in contravention of Niche Polymer's written lockout/tagout policies, or whether that instruction did not include any direction to grind down the rubber roller. On this question, Dotson has presented sufficient evidence such that a reasonable jury could find in his favor, thereby precluding summary judgment.

Niche Polymer claims that Dotson "relies solely on his own testimony that is 'blatantly contradicted' by documentary evidence" and is "wholly at odds with his own prior statements." (ECF No. 60 at 11.) Citing *Workman v. United Artists Theatre Circuit, Inc.*, Niche Polymer suggests that the only issue of fact to determine in this case is which of the conflicting versions of Dotson's testimony is correct. 84 F. Supp. 2d 790, 793 (S.D. W. Va. 2000) ("A genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of the plaintiff's testimony is correct.").

According to Niche Polymer, Dotson first identified plant manager Mike Litton and former maintenance manager Jason Williams as the Niche Polymer employees that exposed him to the unsafe working condition. (*Id.* at 12.) Then, Dotson apparently stated that Jason Adkins was the shift supervisor that intentionally exposed him to the unsafe working condition, but, as Niche Polymer points out, uncontested documentary evidence demonstrates that Adkins was absent from work that day, as well as the days before and after the incident.[5] (*Id.*) Then, after learning that Adkins was absent from work the day of his injury, Niche Polymer claims that Dotson amended his discovery responses to suggest that Ron Whited was privy to the discussion between he and

---

[5] Niche Polymer has attached to its Motion an Employee Time Card representing that Adkins was absent from work from June 8, 2019 through June 11, 2019. (ECF No. 59-10.) Dotson has not otherwise contested the authenticity and legitimacy of the Employee Time Card.

10

Adkins. (*Id.* at 13.) Having identified at least four different Niche Polymer employees with supervisory authority as the individual who gave Dotson the instruction to perform maintenance work on the Line 10 pelletizer, Niche Polymer suggests that Dotson's testimony alone is insufficient to allow a reasonable jury to return a verdict for him as the nonmoving party.

However, this suggestion is flawed, as it assumes that the only triable issue raised by Dotson is "who gave the instruction," and ignores the critical question of "what specifically was he instructed to do." On the latter question, Dotson's version of the facts has maintained sufficient consistency to create a genuine issue of material fact on the issue of intentional exposure. Dotson has consistently maintained that he was instructed to "remove a jam," which he claims he understood would be accomplished by grinding down the pelletizer's rubber roller.

To be sure, Niche Polymer does not contest that Dotson was instructed to perform *some* maintenance on the Line 10 pelletizer. It is Niche Polymer's position, though, that Dotson was instructed to "unclog the pelletizer," which it asserts is a separate and distinct task from "leveling the rollers," which it claims Dotson undertook on his own volition and without direction from his supervisor. However, Dotson has presented evidence that Niche Polymer's pelletizers can clog due to uneven rollers with grooves formed by the extruder continuously feeding it plastic strands.

Notably, shift supervisor Ron Whited testified during his deposition as follows:

> Q. [O]ne of the things that can clog, or plug, one of these [pelletizers] is if the gap between the rollers is off and your material gets put in there all cockeyed. Is that fair?
>
> A. Yes. An improperly set gap can cause a malfunction with that machine, and cause the plug. That's one of the problems it can have.
>
> Q. And as I understand it, what you want to do is there's a – these two rollers, there's a space in between them and if it's dialed in the right way, then it pulls the

> material consistently through and into the machine where it can be cut into the proper nuggets, or pellets. That's what . . . those rollers do. Correct?
>
> A. Yes. They are designed to pull material from the extruder and push it into a pelletizer – into the rotor.
>
> Q. [I]f these rollers . . . get out of adjustment, then it could impede or mess up that whole process. Correct?
>
> A. Yes, it can.

(ECF No. 63-6 at 6–7.) Moreover, former Niche Polymer employee Carl Stamm—who was working on the Line 10 extruder the day Dotson was injured—testified via affidavit as to the method by which clogs, or jams as he puts it, of this sort were remedied:

> 2. During my time at Niche Polymer, LLC, I personally observed Jeremiah Dotson of the maintenance crew at Niche using an angle grinder to remove grooves from the rubber feed rollers of pelletizers. *This was how maintenance cleared a jam in the pelletizers.* When doing this task, the guard in front of the rollers is removed, but the machine stays on and the rollers keep spinning so that maintenance could even out the rubber all the way around the roller.

(ECF No. 63-7 at 1, ¶ 2) (emphasis added). Stamm further testified that on the date of Dotson's injury, he "was working on the Line 10 extruder trying to clear backed up plastic strand." (*Id.* at 1, ¶ 5.) This evidence is a far cry from the apparent self-serving and contradictory testimony Niche Polymer insists Dotson is left to rely on to overcome summary judgment. Rather, viewing this evidence in a light most favorable to Dotson, a reasonable jury could conclude that Dotson was directed to grind down the Line 10 pelletizer's rubber roller as part of the broader instruction to clear the pelletizer's clog.

Niche Polymer insists that this case is akin to the West Virginia Supreme Court of Appeals' ("WVSCA") recent decision in *FirstEnergy Generation, LLC v. Muto*, 832 S.E.2d 58 (W. Va. 2018). In that case the plaintiff brought a deliberate intent action against his employer for head

injuries suffered from a fall while attempting to inspect equipment he was not assigned to inspect in an area of the defendant's facility he was not assigned to work in. *Id.* at 61. During his testimony at trial, the plaintiff acknowledged that he was not asked to inspect any equipment, but that he made the decision to do so himself. *Id.* Rather, he was only assigned to perform a separate task that did not involve the area of the facility where he suffered his injuries. *Id.*

Despite this acknowledgement, the jury returned a verdict in the plaintiff's favor. *Id.* After its renewed motion for judgment as a matter of law was denied, the defendant appealed to the WVSCA, arguing that there was no evidence that the plaintiff was directed to inspect the equipment in the location where his injuries were suffered. *Id.* at 66. The WVSCA agreed, finding that the testimony presented at trial revealed no evidence from which the jury could have reasonably concluded that the defendant intentionally exposed the plaintiff to a specific unsafe working condition, but, at best, indicated that the plaintiff left the control room on his own volition to inspect equipment in a location other than that to which he was assigned. *Id.* at 68.

While it may be true that an instruction to complete one task, and a subsequent injury resulting from the completion of a completely separate and distinct task does not give rise to a deliberate intent claim under West Virginia law, this case presents circumstances distinct from the WVSCA's holding in *FirstEnergy*. First, the rogue task endeavored by the plaintiff in *FirstEnergy* involved a completely separate location of the defendant's facility. Thus, it was clear that the plaintiff had abandoned his assigned task to assist an area of the facility to which he had not been assigned. In this case, the two separate tasks explained by Niche Polymer not only involve the same area of the Ravenswood plant, but they each involve the same exact piece of machinery—the Line 10 pelletizer—Dotson was assigned to perform maintenance on.

13

Second, notwithstanding the fact that the two distinct assignments in *FirstEnergy* involved two completely separate areas of the defendant's facility, the assignments were also completely unrelated—the plaintiff was assigned to check water levels in the facility's pug mill dust collectors, but when he found nothing unusual, he proceeded on his own volition to enter the facility's flyash silo to locate the source of dust causing issues at the facility. By contrast, in the instant case there appears to be sufficient overlap between the two purportedly distinct tasks such that a genuine issue of material fact exists as to whether, as a part of the instruction to unclog the Line 10 pelletizer, Dotson was also tasked with grinding down the pelletizer's rubber roller. At least one other Niche Polymer employee, Carl Stamm, has testified that Niche Polymer's maintenance crew utilized angle grinders to remove grooves from the pelletizers' rubber rollers to clear jams in the pelletizers. (ECF No. 63-7 at 1, ¶ 2.)

While it was clear in *FirstEnergy* that the plaintiff was assigned to one task, but was injured while attempting a completely unrelated and unassigned task, such is not the case here. Rather, as noted above, the critical question for purposes of resolving Niche Polymer's Motion is whether—by instructing Dotson to "clear a jam" or "remove a clog"—he was directed to grind down the Line 10 pelletizer's rubber roller by utilizing the alternative method in contravention of Niche Polymer's written lockout/tagout policies, or whether that instruction did not include any direction to grind down the rubber roller.

Clearly there are conflicting stories between the parties as to what Dotson was specifically assigned to do on the date of his injury. Conflicting evidence presented by both parties does not adequately answer that question in favor of one party over the other. When assessing a motion for summary judgment, this court "must neither resolve disputed facts nor weigh the evidence, nor

make determinations of credibility." *Caudill v. CCBCC, Inc.*, 651 F. Supp. 2d 499, 506 (S.D. W. Va. 2009) (internal citations omitted). Viewing the factual record in a light most favorable to Dotson, genuine issues of material fact exists as to both the specific causation of the Line 10 pelletizer's clog on the date of Dotson's injury, and whether Dotson was instructed to remedy the particular clog via the alternative method of grinding the roller while the pelletizer was energized and operating so as to prevent future clogs of the same sort. Accordingly, summary judgment in Niche Polymer's favor is unwarranted.

## IV. CONCLUSION

Because a reasonable jury could find in Plaintiff's favor with regard to the intentional exposure element of his deliberate intent claim, summary judgment cannot be granted in Defendant's favor. Accordingly, for the reasons stated more fully above, the Court **DENIES** Defendant's Motion for Summary Judgment. (ECF No. 59.)

**IT IS SO ORDERED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

ENTER: June 24, 2022

THOMAS E. JOHNSTON, CHIEF JUDGE